USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10 14 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JARED PAUL STERN,

                Plaintiff,

    - against -

NEWS CORPORATION d/b/a
NEW YORK POST,

               Defendant.

**REPORT AND RECOMMENDATION**

08 Civ. 7624 (DAB) (RLE)

**To the HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

## I. INTRODUCTION

On April 8, 2008, *Pro Se* Plaintiff Jared Paul Stern ("Stern") filed a Complaint against Defendant News Corporation, alleging false light invasion of privacy, defamation *per se*, and tortious interference with business relations. (Compl. ¶ 2.) Stern seeks an award of not less than $100 million in compensatory damages, as well as punitive damages and costs. Pending before the Court is News Corporation's motion for summary judgment against Stern (Doc. No. 24). For the reasons which follow, I recommend that the motion be **GRANTED**.

## II. BACKGROUND

Defendant News Corporation is an international media company with a number of subsidiary companies, including NYP Holdings, Inc. ("NYP"), the owner and publisher of the *New York Post* ("the *Post*"). (News Corporation Stmt. of Undisputed Facts ("SOF") ¶¶ 1-4.) Stern was employed as a writer and editor for the *Post* intermittently in the 1990s and 2000s, up until April 2006, when he was employed as a freelance writer for the *Post*'s book review section and gossip section ("*Page Six*"). (*Id.* ¶¶ 9-10.) In the Spring of 2006, Ronald Burkle ("Burkle"), a sometime subject of the *Page Six* gossip column, alleged to federal authorities that Stern had

asked Burkle for money in exchange for favorable coverage of Burkle in the *Page Six* section. (*Id.* ¶¶ 24-32.) Unbeknownst to Stern, Burkle and his associates videotaped multiple conversations between Stern and Burkle during which Stern asked Burkle for money in exchange for "protection." (*Id.*)

Pursuant to Burkle's allegations, the United States Attorney's Office for the Southern District of New York began to investigate Stern for alleged criminal extortion. (*Id.* ¶¶44-51.) On or about April 6, 2006, an Assistant United States Attorney ("AUSA") called Eugenie C. Gavenchak ("Gavenchak"), an attorney for News Corporation and NYP, to inform her that the United States Attorney's Office was investigating Burkle's allegations against Stern. (*Id.*) No NYP employees other than Stern were discussed during that phone call. (*Id.*) NYP complied fully with the investigation of Stern, and shortly thereafter decided to terminate its relationship with Stern. (*Id.*) During the course of the investigation, several other news outlets, including the *New York Daily News* and the *Washington Post*, published articles describing the investigation and containing quotes from NYP employees discussing the investigation. (*Id.* ¶¶ 52, 56.) The investigation was eventually closed for lack of evidence. (*Id.* ¶ 59.)

In September of 2006, Stern entered into a publishing agreement with Touchstone Fireside, a division of Simon & Schuster, Inc., for a proposed book (Decl. of Mark Gompertz ("Gompertz Decl.") ¶ 3, Feb. 12, 2010.) Some time after the deal was signed, Touchstone Fireside and Stern mutually agreed to end their relationship. (*Id.* ¶ 4). In spring of 2007, Stern brought an action against Burkle and a number of other defendants asserting claims for defamation, emotional distress, and tortious interference arising from the investigation and the news coverage surrounding the investigation. (SOF ¶ 71.) Stern's then-attorney, Larry Klayman ("Klayman"), also approached NYP with a copy of the complaint in the Burkle action,

suggesting that Stern might have similar claims against NYP. (*Id.* ¶ 84.) Klayman also sent Gavenchak a statement from another former employee of the *Post*, Ian Spiegelman, in which Spiegelman made several accusations against the *Post* and its employees. (*Id.* ¶ 85.) Klayman implied to Gavenchuk that Stern was prepared to release the Spiegelman statement to the public unless NYP agreed to a settlement. (*Id.* ¶ 86.) In response, NYP published much of Spiegelman's statement, under the headline "Lies and smears aimed at *Post*." (*Id.* ¶ 87.)

In the instant action, Stern brings defamation and false light claims based on statements made by NYP employees in articles published by other news outlets, as well as the *Post* article describing the Spiegelman statement. (Compl. ¶¶ 27-39.) Nine specific statements are cited by Stern as the basis for his claim: 1) a statement by Howard Rubenstein ("Rubenstein"), spokesperson for the *Post*, that the AUSA who called Gavenchak "only inquired about Jared Stern," published in the *New York Daily News* on April 8, 2006; 2) Rubenstein's assertion in the same article that "it's only one person" [involved in the extortion scandal]; 3) a quote from the *Post*'s Editor-in-Chief, Col Allan, published in the *Washington Post* on April 8, 2006, remarking, "if the allegations are true . . . Mr. Stern's conduct would be morally and journalistically reprehensible, a gross abuse of privilege, and in violation of the *New York Post*'s standards and ethics"; 4) a quote from Rubenstein in the same article, stating that the AUSA, in talking to Gavenchak "explained that Stern had been 'asking for $100,000 up front not to print bad articles and to print good items,' and for $10,000 a month after the initial down payment; 5) Rubenstein's assertion in the same article that *Post* staff members were "appalled" by the investigation of Stern; 6) the headline of the *Post* article about the Spiegelman statement: "Lies and smears aimed at *Post*"; 7) descriptions of Stern in the same article as "a rogue former freelancer" and a "disgraced journalist"; 8) a statement from the same article that Stern "was

3

investigated for alleged extortion by the U.S. Attorney's Office;" and 9) a statement from the same article that Stern sent the Spiegelman statement to the *Post* with a demand for money. (*Id.* ¶ 33; SOF ¶¶ 81-87.) Finally, Stern is alleging that NYP tortiously interfered with his agreement with Touchstone Fireside. (Compl. ¶¶ 41-42.)

### III. DISCUSSION

#### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if it determines that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Under this standard, summary judgment is proper if "viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 875 F.2d 1008, 1015 (2d Cir. 1989) (internal quotations omitted), *rev'd on other grounds*, 496 U.S. 633 (1990). In making this determination, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where no reasonable trier of fact could find in favor of the nonmoving party, *H. L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989), thereby "dispos[ing] of meritless claims before becoming entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987).

The party moving for summary judgment bears the initial burden of demonstrating the

absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568 (2d Cir. 1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party satisfies this initial burden, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment." *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985). If the nonmoving party fails to respond by "affidavits or as otherwise provided in [Rule 56, and] set forth specific facts showing that there is a genuine issue for trial[,] . . . summary judgment, if appropriate, [shall] be entered against [the adverse] party." FED. R. CIV. P. 56(e).

### B. News Corporation is Entitled to Summary Judgment

Stern has not submitted any affidavits or documentary evidence in response to News Corporation's summary judgment motion. The Second Circuit has held "that an easily comprehensible notice from the party moving for summary judgment would suffice" to put a *pro se* litigant on notice of the consequences of failing to respond to a summary judgment motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citing *Graham v. Lewinski*, 848 F.2d 342, 345 (2d Cir. 1988)). Pursuant to Local Civil Rule 56.2, News Corporation sent such notice to Stern as an accompaniment to the summary judgment motion. (Doc. No. 27). In addition, Judge Batts filed an order on July 2, 2010, apprising Stern of the need to respond to News Corporation's motion, the deadline for filing his response, and the consequences of failing to respond. (Doc. No. 30). As a result of Stern's failure to timely file a response despite these many

5

warnings, this Court may accept News Corporation's factual assertions as true and legal authorities as unchallenged. *See Champion*, 76 F. 3d at 486. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically. Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law.'" *Id.* Therefore this Court must examine News Corporation's Statement of Uncontested Facts in light of the applicable law to determine whether summary judgment is appropriate.

**1. Choice of Law**

As a threshold matter, the Court must determine which state's law governs this diversity suit, originally filed in Florida and subsequently transferred to this district. A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). New York applies the *Babcock* "significant relationship" test to choice of law questions, which examines which jurisdiction has the greatest interest in the adjudication of the case. *See Babcock v. Jackson*, 12 N.Y.2d 473, 482-83 (1963). In a libel case, important factors for this test include where the publication took place and the residence of the parties at the time of publication. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999); *Hatfill v. Foster*, 415 F. Supp. 2d 353, 365-68. Here, Stern was living in New York when the events in question took place, although he is now a Florida resident. (*See* Compl. ¶ 26.) Additionally, as News Corporation enumerates, " News Corporation's principal place of business was and is also in New York, Stern worked for NYP in New York, his alleged acts of extortion took place in New York, the Stern Investigation took place in New York, and [Stern's] alleged relationship with Simon & Schuster occurred in New York." (Def.'s Mem. in Supp. of Mot. to Dismiss ("Mem. in Supp.") 9 n. 8, June 30, 2010.) All of these facts, taken together,

6

establish that New York has the most significant relationship with this case, and thus it is New York law that will govern Stern's claims.

### 2. Stern's False Light Claim

Stern's first claim is based on the tort of "false light invasion of privacy." New York law does not recognize a cause of action based on this or other common law privacy torts. *Howell v. New York Post Co.*, 81 N.Y.2d 115, 123-24 (1993); *Cardone v. Empire Blue Cross and Blue Shield*, 884 F. Supp. 838, 848 (S.D.N.Y.1995). As a result, Stern's first claim fails as a matter of law.

### 3. Stern's Defamation Claim

As described above, Stern's defamation claims rest on various statements by NYP employees published in articles in the *New York Daily News* and the *Washington Post* on April 8, 2006, as well as a *Post* article published on May 18, 2007. In order to make out his claim for defamation, Stern must prove "a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and [the statement] must either cause special harm or constitute defamation per se." *Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999). News Corporation asserts that Stern has failed to meet this burden, and challenges the use of each of the three articles as a basis for Stern's defamation claim, as well as offering defenses relating to each of the nine individual statements.

      a. The timeliness of Stern's claims related to the *New York Daily News* and *Washington Post* articles

Five of the nine allegedly defamatory statements referenced by Stern in his complaint were published on April 8, 2006. News Corporation contends that any claims arising from these articles are time-barred. This Court agrees. Under New York law, the statute of limitations for a

libel claim is one year. N.Y. C.P.L.R. § 215(3). It is long-settled that the limitations period in such cases begins to run from the original publication of the offending material. *See, e.g., Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 123-24 (1948). Stern commenced the instant action against News Corporation on April 8, 2008, two years after the publication of the *New York Daily News* and *Washington Post* articles. As a result, his claims as to these articles are time-barred.

                b. The proper party for Stern's claims related to the *New York Post* article

News Corporation argues that it is not a proper party to Stern's defamation claims arising from the *New York Post* article because it does not publish the *Post* and cannot be held liable for the tortious acts of a subsidiary. Once again, this Court agrees. Under New York law, a defendant cannot be held liable for defamatory statements published by a third party. *See Schoepflin v. Coffey*, 56 N.E. 502 (1900); *Scally v. Kovac*, 374 N.Y.S.2d 54 (N.Y. App. Div. 1975). *See also Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 434-35 (1981) (authors of a hardcover book were not liable for the paperback edition when they had no role in republication); *Lunney v. Prodigy Services Co.*, 683 N.Y.S.2d 557, 562-63 (N.Y. App. Div. 1998) (online service company was not liable for defamatory misuse of its services by a third party). New York law also holds that a parent corporation cannot be held liable for a subsidiary's torts, unless it is proven that the subsidiary is wholly dominated and controlled by the parent corporation such that piercing the corporate veil is justified. *See, e.g., Billy v. Consolidated Machine Corp.*, 51 N.Y.2d 152, 162-64 (1980). That is not the case here. NYP, the publisher of the *Post*, is but one of the many subsidiary companies of News Corporation. (SOF ¶¶ 1-4.) There are two separate intermediary corporations between News Corporation and NYP. (Decl. of Eugenie C. Gavenchak ("Gavenchak Decl.") ¶ 3, June 29, 2010.) "NYP controls the

8

newsgathering, editing, printing, and distribution of the *Post*." (*Id.* ¶ 4). There are no facts in the record that indicate any more control of NYP on the part of News Corporation. Therefore, Stern's defamation claims based on the *Post* article should be dismissed as having been brought against an improper party.

    c. Defenses relating to individual statements

Even if Stern's claims were found to be timely and against a proper party, News Corporation contends that none of the individual allegedly defamatory statements are actionable under New York Law. The Court agrees.

    (1) Statements 1, 2, 4, 8, and 9

News Corporation argues that statements 1, 2, 4, 8, and 9 are not actionable because they are true. "Truth is a complete defense to an action for libel, regardless of the harm done by the statements." *Han v. State*, 588 N.Y.S.2d 358, 360 (2d Dep't 1992). In actions such as this one, where the challenged statements are a matter of public concern, the First Amendment to the United States Constitution requires that the plaintiff bear the burden of proving falsity. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986). In this case, News Corporation has put forth evidence supporting the truth of the statements at issue, namely: that Stern was investigated by the United States Attorneys for extortion (statement 8) (Gavenchuk Decl. ¶ 7); that Stern was the lone subject of the investigation (statements 1 & 2) (*Id.*); that the investigation concerned allegations that Stern had demanded an initial payment of $100,000 and subsequent monthly payments of $10,000 in order to ensure that only favorable news about Burkle was printed in *Page Six* (statement 4) (*Id.*); and that Stern, through Klayman, sent the Spiegelman statement as part of a demand that News Corporation settle his threatened suit against them (statement 9). (*Id.* ¶ 14). Stern has submitted no evidence tending to disprove the

9

truth of these statements. As a result, this Court must find that statements 1, 2, 4, 8, and 9 are true and therefore not actionable.

(2) Statement 6

News Corporation asserts that Stern's claim as to the headline of the *New York Post* article, "Lies and smears aimed at *Post*," should be dismissed because the statement is not about Stern. "It is essential in making out a prima facie case in libel to prove that the matter is published of and concerning the plaintiff." *Julian v. Am. Bus. Consultants, Inc.*, 2 N.Y.2d 1, 17 (1956). The plaintiff bears the burden of proving that, "the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant. It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that he is the person meant." *Fetler v. Houghton Mifflin Co.*, 364 F.2d 650, 651 (1966) (citing *Miller v. Maxwell*, 16 Wend. 9, 18 (N.Y.Sup.Ct.1836)). This burden has been found to be met in cases where a thinly veiled fictional character was used to defame plaintiff, *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980), where plaintiff did business using the name of a third-party company and defamatory statements were made about the third party, *Golden Bear Distributing Systems v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir. 1983), and where evidence showed that the president and chief executive officer of a corporation made all business decisions for the corporation, and therefore was defamed by allegations of fraud and corrupt practices. *Caudle v. Thomason*, 942 F. Supp. 635 (D.D.C. 1996). Conversely, where plaintiff is simply a member of an organization or employee of a company about which defamatory statements have been made (or where plaintiff is simply an organization or company with a member or employee about whom defamatory statements have been made), these statements are generally found not to be "of and concerning" the plaintiff. *See, e.g., Julian*, 2 N.Y.2d at 18

(book containing defamatory statements about the Communist Party did not defame plaintiff simply because he was listed as having attended two party meetings); *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (affirming dismissal of defamation claims brought by individual investors when the allegedly defamatory statements were made about an enterprise in which they invested and did not mention the individual investors); *Cohn v. Nat'l Broadcasting Co.*, 414 N.Y.S.2d 906 (1st Dep't 1979) (deciding that it is not defamatory of a law firm to say something defamatory about one of its partners), *aff'd*, 408 N.E.2d 672, *cert. denied*, 449 U.S. 1022 (1980). *See also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) ("A false disparaging statement about IBM, for example, would not, we think, ordinarily be a defamatory statement 'of and concerning' all of IBM's suppliers, employees and dealers, however much they may be injured as a result.").

News Corporation argues that the primary content of the *New York Post* article addresses the Spiegelman statement, and that the article's repeated use of phrases such as "Speigelman's claims" make clear that the headline of the article refers exclusively to Speigelman. (Mem. in Supp. 20.) The article, however, both leads and closes with reference to Stern, and suggests that Stern and Spiegelman are friends and that Stern's potential lawsuit would be based on Spiegelman's statement. (Gavenchuk Decl., Exhibit E). It seems possible that a reasonable reader might understand the article's headline to refer both to Spiegelman's statements and to Stern's actions, and therefore interpret the headline as being "of and referring to" Stern. If News Corporation were a proper party to this lawsuit, Stern's claim based on Statement 6 could not be dismissed as a matter of law.

### (3) Statements 3, 5, and 7

News Corporation contends that Stern cannot base his defamation claims on statements

11

3, 5, and 7 because those statements are constitutionally protected opinion. As the New York Court of Appeals has elaborated, "Plaintiff[s] may not recover from defendants for simply expressing their opinion . . . no matter how unreasonable, extreme or erroneous these opinions might be. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380 -381 (1977). The Court of Appeals has laid out a three-factor test to determine whether a statement is considered to be opinion: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993) (internal citations omitted).

News Corporation asserts that under this standard, Statement 3 ("Stern's conduct would be morally and journalistically reprehensible, a gross abuse of privilege, and in violation of the *New York Post*'s standards and ethics"), Statement 5 (*Post* staff members were "appalled" by the allegations against Stern), and Statement 7 (Stern is a "rogue former freelancer" and a "disgraced journalist") should all be held to be non-actionable opinion. The Court agrees with regard to Statements 3 and 5. The statements contain such rhetorical hyperbole that it would be clear to most readers that they represent the opinion of the speaker. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990). Further, both statements are clearly presented in the context of the federal investigation of Stern. Statement 5 simply presents the emotional response of *Post* employees to the investigation, while Statement 3 clearly reflects the speaker's opinion of what the situation would be *were* the allegations against Stern to be proved true.

Statement 7, however, is less clear cut. While some courts have interpreted the word

"rogue" as being too imprecise to be actionable, *see Kowalski v. Greski*, 2009 WL 1218666 at *1 (Conn. Super. Ct. Apr. 9, 2002); *Ray v. Bossier City*, 859 So. 2d 264, 275 (La. App. 2003), the article's characterization of Stern as a "disgraced journalist" seems to go beyond mere opinion or "rhetorical hyperbole." As the United States Supreme Court has argued, "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich,* 497 U.S. at 18-19. Here, the use of the term "disgraced journalist" implies concrete knowledge that Stern has done something worthy of disgrace. While Statements 3 and 5 were made in the context of the ongoing investigation against Stern, Statement 7 was made after the investigation closed. While the *Post* article states that Stern was investigated but never charged, characterizing Stern as "disgraced" may be read to suggest that the allegations against Stern were true. As a result, if News Corporation were a proper party to this lawsuit, Stern's claims based on Statements 3 and 5 should be dismissed, but his claim based on Statement 7 should be found to be actionable.

### 3. Stern's Tortious Interference with Business Relations Claim

Stern's final claim is one of tortious interference with business relations, based on News Corporation's alleged procural of Simon and Schuster's breach of their book contract with Stern. (Compl. ¶¶ 40-44.) In order to establish this claim, a plaintiff must prove that, "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Stern has offered no

13

evidence to establish these elements, beyond a claim that News Corporation knew of the relationship between Stern and Simon and Schuster. (Compl. ¶ 41.) News Corporation, however, has put forward evidence tending to prove that the contract between Stern and his publisher was dissolved by mutual agreement, (Gompertz Decl., ¶ 4,) and that News Corporation made no attempt to influence the relationship and in fact had no influence on the relationship. (*Id.* ¶ 5.) Thus there exists no issue of material fact relating to Stern's tortious interference claim, and this claim should also be dismissed.

## IV. CONCLUSION

In conclusion, I recommend that Defendant's motion be **GRANTED**.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); FED. R. CIV. P. 72, 6(a), 6(d).

Dated: October 14, 2010
New York, New York

Respectfully Submitted,

_____
**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

**Copies of this Report and Recommendation were sent to:**

<u>*Pro Se* Plaintiff</u>
Jared Paul Stern
8284 Route 81
Oak Hill, NY 12460

<u>Counsel for Defendant</u>
Theresa House
Hogan & Hartson LLP (FL)
1111 Brickell Avenue, Suite 1900
Miami, FL 33131

Slade R. Metcalf
Hogan & Hartson L.L.P.(NYC)
875 Third Avenue
New York, NY 10022